**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TDBBS LLC, | No. CV-19-01312-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Ethical Products Incorporated, | |
| Defendant. | |

Pending before the Court is the motion for a temporary restraining order ("TRO") of Plaintiff TDBBS, LLC ("Plaintiff"). (Doc. 1, 3.) The motion was filed on February 25, 2019, and the Court held a hearing earlier today. As explained below, the TRO request will be denied, without prejudice to Plaintiff's separate request for a preliminary injunction.

**BACKGROUND**

Plaintiff is a manufacturer of pet chews and treats. (Doc. 1 ¶ 17.) In March 2017, Plaintiff hired Timothy Fabits ("Fabits") to serve as its vice president of sales. (*Id.* ¶ 30.) Fabits's employment with Plaintiff ended on May 31, 2018. (*Id.* ¶ 64.) Afterward, in or around August 2018, Fabits began working for Ethical Products, Inc. ("Ethical"). (*Id.* ¶ 103.) Plaintiff contends that Fabits stole confidential and/or trade secret information during his last few months of employment and provided that information to Ethical so it could enter the pet chews and treats market. (*Id.* ¶¶ 56-104.) The information included (1) "lost revenue" reports, which "contained detailed information showing, by product and consumer, any quantity differences between amounts ordered and amounts shipped," and

(2) Plaintiff's "confidential master product information spreadsheet . . . , which contains extensive data on every [relevant] product, including detailed information on pricing tiers." (*Id.* ¶¶ 67, 71.)

Notably, this is not the first lawsuit Plaintiff has filed concerning these allegations. In September 2018, Plaintiff sued Fabits in Arizona state court. (*Id.* ¶ 3.) Plaintiff's complaint in that case ("the *Fabits* litigation") asserted federal and state-law claims for theft of trade secrets and also sought injunctive relief against Fabits. (Case No. 18-cv-3566-DJH, Doc. 1-3.) The *Fabits* litigation was later removed to federal court and is currently pending before Judge Humetewa. (Case No. 18-cv-3566-DJH, Doc. 1.)

Although Ethical is not a party to the *Fabits* litigation, it is not a stranger to the proceedings. For example, on January 2, 2019, Plaintiff served a Rule 45 subpoena on Ethical that sought various documents. (Doc. 3-1 at 5-16; Case No. 18-cv-3566-DJH, Docs. 15, 15-1.) Additionally, in the parties' Rule 26(f) report, which was filed more than a month ago, Plaintiff noted that it "may seek leave to add Ethical Pet as a defendant if the facts warrant." (Case No. 18-cv-3566-DJH, Doc. 22 at 4.) The Court also notes that Plaintiff requested a relaxed case management schedule in the *Fabits* litigation, with a discovery deadline in January 2020. (*Id.* at 6.)

Here, Plaintiff alleges that on February 4, 2019, it learned for the first time—based in part on Ethical's response to the Rule 45 subpoena in the *Fabits* litigation—that Ethical had successfully developed a competing product line by using the information stolen by Fabits. (Doc. 1 ¶ 107.) Plaintiff contends that Ethical necessarily must have utilized the stolen information because it should have taken Ethical 18 months to develop a competing product. (*Id.* ¶¶ 117-18.) The complaint further alleges that Ethical is about to display its new product line at a trade show[1] and has plans to display its new product line at a larger trade show in Florida in mid-March 2019. (*Id.* ¶¶ 122-36.) Thus, Plaintiff seeks a TRO that would (1) require Ethical to immediately stop using, and return, all of Plaintiff's trade

---

[1] The first trade show is the "annual Spring Trade Show on February 26-27, 2019" held by "Bradley Caldwell, Inc., . . . a distributor of pet products." (Doc. 1 ¶¶ 122-23.) Plaintiffs filed their TRO request on February 25, 2019, the day before this show began.

secrets and confidential information, (2) prohibit Ethical from promoting its new product line or any other animal body parts product line at the two trade shows, and (3) prohibit Ethical from participating in the pet treats and chews business for the next 18 months with Fabits's assistance or using any of Plaintiff's trade secrets or confidential information. (Doc. 3 at 2.)

During today's hearing, Ethical denied that it utilized Plaintiff's protected information when developing its new product line. Among other things, Ethical's counsel argued that (1) although Fabits shouldn't have emailed the master spreadsheet to himself on his last day of work, he quickly realized this was wrong and deleted the spreadsheet without providing it to Ethical,[2] (2) the document that Ethical produced in response to the Rule 45 subpoena on February 4, 2019, is different from the two documents that Fabits emailed to himself while working for Plaintiff (and thus doesn't prove that Fabits transmitted any protected information to Ethical), (3) Fabits swore under oath, in response to an interrogatory from Plaintiff in the *Fabits* litigation, that he has never provided any of Plaintiff's trade secret or confidential information to Ethical, and (4) Fabits was a veteran of the pet treats and chews industry long before he joined Plaintiff, so it would be illogical to assume that any information he possessed when joining Ethical was a trade secret derived from Plaintiff. Additionally, Ethical's in-house counsel stated during today's hearing that he reviewed a large quantity of documents during the *Fabits* litigation and has derived a good-faith belief, based on that document review, that Ethical isn't in possession of any of Plaintiff's confidential or trade secret information. (Counsel was unwilling, however, to provide a formal certification on this point.)

**ANALYSIS**

A.  Legal Standard

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. There

---

[2] Fabits made a similar claim in the Rule 26(f) report in the *Fabits* litigation. (Case No. 18-cv-3566-DJH, Doc. 22 at 3-4 ["Defendant asserts that he deleted the only document of any sensitivity . . . shortly after leaving Plaintiff's employ and never made use of the document in any way."].)

are two types of injunctions available under Rule 65: TROs and preliminary injunctions. TROs may be issued without notice to the adverse party and are of limited duration. *See* Fed. R. Civ. P. 65(b). Preliminary injunctions, in contrast, may only be issued after adequate notice is provided to the adverse party. *See* Fed. R. Civ. P. 65(a). *See generally Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000) ("The interplay between Rule 65(a) (governing preliminary injunctions) and Rule 65(b) (governing TROs) is fluid, requiring greater procedural formality and notice for preliminary injunctions that remain operative for an unlimited time period. . . . Because a preliminary injunction is unlimited in duration, its entry always requires notice to the opposing party sufficient to give that party an opportunity to prepare an opposition to entry of an injunction.").

Here, Plaintiff seeks both types of injunctions. (Doc. 3.) However, during today's hearing, both parties agreed that the Court should only consider the TRO request for the time being and should defer resolution of the preliminary-injunction request. Accordingly, the Court will do so.[3]

A request for a TRO is analyzed under the same standards as a request for a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("A preliminary injunction is an extraordinary remedy never awarded as of right"). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But

---

[3] In general, "[i]f a party says that it is seeking a TRO but actually gives proper notice [to the adverse party], the court may choose to consider it as a motion for a preliminary injunction under Rule 65(a)." Steven S. Gensler, 2 Federal Rules of Civil Procedure, Rules and Commentary, Rule 65, at 317 (2018). The Court declines to follow this approach here because, as noted above, the parties consented to the contrary.

- 4 -

if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

B. Analysis

1. **Likelihood of Success/Serious Questions**

Plaintiff argues it has demonstrated a likelihood of success on the merits because (1) there is documentary evidence proving that Fabits emailed key internal documents to his personal email account right before he stopped working for Plaintiff, (2) "[t]here is no question that the information and materials . . . constitute trade secrets," (3) Ethical's president admitted in an internal email that the reason Ethical was hiring Fabits was to obtain Plaintiff's secret information, and (4) Ethical knew the information was protected because it had access to Fabits's employment agreement with Plaintiff, which included a prohibition on the use of Plaintiff's trade secrets. (Doc. 3 at 11-15.)

The Court concludes, based on the limited material now before it, that although Plaintiff has shown the existence of "serious questions" going to the merits, it hasn't gone further and demonstrated a likelihood of success. First, although Fabits's decision to email sensitive documents to himself on his last day of work is highly suspicious and raises an inference of wrongdoing, Ethical's counsel has identified several reasons to question whether the sensitive information was ultimately transmitted to Ethical. Fabits has averred under oath that it wasn't transmitted, Ethical's in-house counsel has voiced his good-faith belief, as an officer of the Court, that it wasn't transmitted, and the document that Ethical produced on February 4 is different from the documents that Fabits previously emailed himself. Further evidentiary development is needed to assess the parties' competing claims

on this issue.

Second, although it's possible (or even probable) that the materials taken by Fabits constitute trade secrets, this isn't a foregone conclusion. This isn't a case involving, for example, secret manufacturing formulas. Fabits is accused of stealing sensitive pricing, customer, and supplier information, but Fabits is a veteran of the industry who may have derived his knowledge of these topics from independent sources. Once again, further evidentiary development is needed.

Third, the Court is also unwilling to uncritically accept Plaintiff's assertion that, but for the alleged theft of trade secrets, it would take 18 months for a company like Ethical to develop a competing product and enter the market. Ethical was a preexisting company that had experience manufacturing and selling pet treats and chews and the products at issue aren't particularly complex.

Fourth, the Court disagrees with Plaintiff's interpretation of the email from Ethical's president—this email isn't necessarily the "smoking gun" that Plaintiff believes it to be. A reasonable juror could interpret the email as describing a lawful plan to compete with Plaintiff based on perceived weaknesses in Plaintiff's business and changes to Plaintiff's ownership structure (as opposed to an unlawful plan to compete with Plaintiff by hiring an employee of Plaintiff's who was willing to divulge trade secrets). The email does not, for example, make any express reference to the concept of stolen documents.

Fifth, it is worth noting that, although Plaintiff has been in litigation with Fabits since September 2018, based on the same underlying set of facts, Plaintiff still hasn't sought a preliminary injunction against Fabits in that case (even though its complaint includes a claim for injunctive relief) and hasn't amended its complaint in that case to assert claims against Ethical (even though it stated, in the 26(f) report, that it would move to amend if the facts supported an amendment).

For all of these reasons, although Plaintiff may end up prevailing on its claims against Ethical, the limited facts presented to the Court for purposes of the TRO proceeding leave too many questions unanswered and prevent the Court from concluding that Plaintiff

has met its burden of demonstrating a likelihood of success on the merits.

2. **Irreparable Injury**

Plaintiff argues that because it has shown Ethical stole its trade secrets, it follows that it has suffered irreparable harm. (Doc. 3 at 15-16.)

The Court disagrees. First, although Plaintiff has known about the alleged theft since no later than September 2018 (when it sued Fabits), it waited over five months to seek emergency injunctive relief. Moreover, although Plaintiff contends the impetus for its request was its recent discovery that Ethical had succeeded in developing a competing product line and had plans to market that product line at upcoming trade shows, the discovery occurred on February 4, 2019, yet Plaintiff didn't file its motion for three weeks, on the literal eve of the first trade show. These circumstances cut against a finding of irreparable harm. *See, e.g., Oakland Tribune, Inc. v. Chronicle Pub. Co.,* 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm."); *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").

Second, although courts sometimes grant injunctions in the trade-secrets context based on findings of irreparable harm,[4] it's not true (as Plaintiff seems to suggest) that irreparable harm *necessarily* exists in this context. *See, e.g.*, *Calence, LLC v. Dimension Data Holdings, PLC*, 222 Fed. App'x 563, 566 (9th Cir. 2007) ("Even assuming that this case involves trade secrets, the district did not err in failing to presume irreparable harm because of alleged trade secret loss."); *Ossur Holdings, Inc. v. Bellacure, Inc.*, 2005 WL 3434440, *8 (W.D. Wash. 2005) ("Courts in the Ninth Circuit erect a presumption of irreparable harm where a plaintiff proves likely success on the merits of a copyright or trademark infringement claim; however, the court is aware of no binding authority that

---

[4] *See, e.g. Versaterm Inc. v. City of Seattle*, 2016 WL 4793239, *7 (W.D. Wash. 2016) (citations omitted) ("Irreparable harm may occur where '[p]ublic disclosure of a trade secret' is threatened because such disclosure "destroys the information's status as a trade secret.' Disclosure also allows 'competitors to reproduce [the] work without an equivalent investment of time and money.' Further, evidence that trade secrets are likely to be disclosed may support a finding of irreparable harm.").

applies such a presumption in the context of a trade secrets claim.").

At bottom, Plaintiff is asserting a claim for financial injuries in this case—the loss of sales and goodwill arising from Ethical's alleged misconduct. However, "[p]urely monetary injuries are not normally considered irreparable." *Lydo Enters.*, 745 F.2d at 1213; *see also Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury. . . . 'The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.'"). Thus, to demonstrate irreparable harm, Plaintiff must do more than simply assert a theft of trade secrets—it must point to something specific about Ethical's misconduct that is generating a type of harm that can't be measured or compensated via money damages.

Although Plaintiff may be able to do so in a future proceeding, Plaintiff hasn't done so yet. Although Plaintiff asserts that Ethical's conduct is causing "incalculable diminishment in the value of [the trade secret information] and loss of goodwill" (*see* Doc. 3 at 16), it provides no support for these assertions. Notably, Plaintiff also doesn't allege that Ethical is making further disclosures of the protected information. In this respect, this case resembles *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110 (2d Cir. 2009). There, the Second Circuit reversed the issuance of a preliminary injunction in a trade secrets case based on the plaintiff's failure to demonstrate irreparable injury. The court explained:

> Some courts . . . [have held] that a presumption of irreparable harm automatically arises upon the determination that a trade secret has been misappropriated. That reading is not correct. A rebuttable presumption of irreparable harm might be warranted in cases where there is a danger that, unless enjoined, a misappropriator of trade secrets will disseminate those secrets to a wider audience or otherwise irreparably impair the value of those secrets. Where a misappropriator seeks only to use those secrets—without further dissemination or irreparable impairment of value—in pursuit of profit, no such presumption is warranted because an award of damages will often provide a complete remedy for such an injury. Indeed, once a trade secret is misappropriated, the misappropriator will often have the same

incentive as the originator to maintain the confidentiality of the secret in order to profit from the proprietary knowledge.

*Id.* at 118-19. The Court finds this logic compelling and reaches the same conclusion here.

### 3. **Balance of Equities**

Plaintiff argues the balance-of-equities factor weighs in its favor because it is currently suffering irreparable harm and Ethical wouldn't "suffer harm to any legitimate interest" from the requested injunction because Ethical "simply would be prevented from realizing any ill-gotten gains from its wrongful actions." (Doc. 3 at 17.)

The Court disagrees and concludes this factor is neutral. Although Plaintiff has raised serious questions about its ability to prevail, Plaintiff hasn't established a likelihood of success on the merits. Thus, the Court can't say that Ethical lacks any legitimate interest in continuing its challenged activity. *Cf. Fox Television Stations, Inc. v. BarryDriller Content Sys., PLC*, 915 F. Supp. 2d 1138, 1147 (C.D. Cal. 2012) ("To the extent that the Court finds that Plaintiffs are likely to succeed on the merits here, then Defendants have no equitable interest in continuing an infringing activity."). Also, it can't be overlooked that Plaintiff has known about Fabits's alleged misconduct for over five months, and has known about Ethical's development of the new product line and plans to attend trade shows for three weeks, yet chose to wait until a few hours before the first trade show began to file its TRO request. This is not the proper way to present a claim for emergency relief that is purportedly necessary to avoid imminent, irreparable injury. *Cf. Ruvalcaba v. Citibank*, 2012 WL 12878654, *2 (C.D. Cal. 2012) (citation omitted) ("To justify *ex parte* relief, 'it must be established that the moving party is without fault in creating the crisis that requires *ex parte* relief, or that the crisis occurred as a result of excusable neglect.' . . . In this case, the Court finds that Plaintiff unreasonably delayed in seeking relief, and that the emergency that allegedly justifies a TRO is self-created.").

### 4. **Public Interest**

Plaintiff argues this factor weighs in its favor because public policy favors protecting business from theft and preventing unfair competition. (Doc. 3 at 17.)

1    Although the Court concludes this factor tips slightly in Plaintiff's favor, it's not a slam dunk. There is, of course, a strong public interest in protecting trade secrets from theft, but it's not obvious (at least based on the limited record before the Court) that Plaintiff is going to prevail on its trade secrets claim. And an improperly-issued injunction would undermine the public's interest in promoting free market competition.

5. **Conclusion**

The Court concludes that Plaintiff is not entitled to a TRO. Plaintiff hasn't demonstrated a likelihood of irreparable injury and hasn't shown that the balance of equities weighs in its favor.

For these reasons, the Court is also unwilling to grant Plaintiff's alternative request, made during today's hearing, to issue a limited TRO that would only compel Ethical to stop using and return any of Plaintiff's confidential and trade secret information. As discussed above, it is unclear whether Ethical possesses any such information. Injunctive relief is "an extraordinary and drastic remedy" that is available only when "the movant, by a clear showing, carries the burden of persuasion." *Lopez,* 680 F.3d at 1072 (citations and internal quotation marks omitted). Additionally, issuing such an injunction now, where the Court hasn't yet determined how much of the information at issue is a trade secret, how much is confidential, and how much is general knowledge possessed by Fabits, could cause more problems than it would solve.

The Court will note, however, that it is mindful of the legitimate arguments made by Plaintiff's counsel concerning the difference between an in-house attorney's good-faith belief that his client isn't utilizing any improper information and a formal under-oath certification from the client on that topic. Although it wouldn't have been fair to expect Ethical to have such a certification ready by today's hearing—it had very little notice—that timing issue won't be present by the time Ethical files its response to the preliminary injunction.

Accordingly, **IT IS ORDERED** that Plaintiff's request for a temporary restraining order (Docs. 1, 3) is **DENIED**.

**IT IS FURTHER ORDERED** that the Court will address Plaintiff's request for a preliminary injunction after Ethical has had an opportunity to file an answer or otherwise respond in the action and to respond to Plaintiff's request for a preliminary injunction. The Court **directs** Ethical to file its answer and a response to Plaintiff's request for a preliminary injunction **by March 11, 2019**. The Court will endeavor to rule upon the preliminary injunction request before March 20, 2019, which is when the second trade show is scheduled to begin.

Dated this 28th day of February, 2019.

Dominic W. Lanza
United States District Judge