**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TDBBS LLC, | No. CV-19-01312-PHX-SMB |
| Plaintiff, | **ORDER** |
| v. | |
| Ethical Products Incorporated, | |
| Defendant. | |

Plaintiff filed a request for a preliminary injunction and a hearing was held on March 13, 2019. The Court has now considered the pleadings, testimony and exhibits from the hearing, relevant case law and arguments of counsel.

**I.  Background**

Plaintiff TDBBS, LLC ("TDBBS") is a pet chews and treats business. (Doc. 1 ¶ 1). Defendant Ethical Products, Inc. ("EPI") is a potential competitor of TDBBS that hired Timothy Fabits ("Fabits"), a former employee of TDBBS. (*Id.* ¶ 2). Fabits was the Vice President of Sales for most of his employment at TDBBS, and EPI hired him to be the General Manager of a new product line EPI planned to build to compete with TDBBS. The dispute concerns whether EPI misappropriated TDBBS's trade secrets and confidential information to help EPI jump start a competing line of pet chews and treats. (*Id.* ¶ 2).

Fabits is a veteran of the pet food industry. He was hired by TDBBS in March 2017 after working for Redbarn, another competitor in the industry, for 14 years. (*Id.* ¶ 32). The relationship between Fabits and TDBBS deteriorated and his employment ended on May

31, 2018. (*Id.* ¶¶ 52–64; Doc. 28, Exh. 1 ¶ 28). Though it is difficult for the Court to understand the entirety of the relationship from the pleadings and the hearing, it appears that the disagreements between Fabits and TDBBS hit a crescendo in mid-to-late April 2018, when he was notified by TDBBS's new CEO that he would no longer be the VP of Sales and his base compensation would be reduced. (Doc. 28, Exh. 1 ¶ 22). Though the new compensation package would allow for a larger bonus that could make up the difference, Fabits alleges that the bonus increase was "meaningless" due to "TDBBS's inability to support" a growth in sales. (*Id.*).

On Fabits's last day, TDBBS sent him a separation agreement around 12pm MST. (Doc. 28, Exh. 1 ¶ 28). That same afternoon, he sent an email to TDBBS asking for the "master," which he subsequently forwarded to his personal email account. (Doc. 1, Exh. G). The "master," also called the "Master List," is a spreadsheet containing extensive pricing information for TDBBS's products. (*Id.* ¶ 71). TDBBS alleges it is a trade secret. (*Id.* ¶¶ 65–78). TDBBS also alleges Fabits had been forwarding himself "lost revenue reports" containing "detailed information showing . . . any quantity differences between amounts ordered and amounts shipped," which they also allege to be a trade secret. (*Id.* ¶ 67). Fabits forwarded the Lost Revenue Reports to his personal email on March 27, April 2, and April 19. (Doc. 20, Exh. F). Within TDBBS, these documents are "limited to specific individuals who have a particular TDBBS business need for them." (Doc. 20 ¶ 75).

In addition to this lawsuit, TDBBS previously filed similar allegations against Fabits (the "*Fabits* Litigation"). That case is currently pending before Judge Humetewa after it was removed from state court in October 2018. (Case No 18-cv-3566-DJH, Doc. 1). EPI is not a party to the *Fabits* Litigation, but it is aware of the case and TDBBS noted in that case's Rule 26(f) report that it "may seek leave to add Ethical Pet as a defendant if the facts warrant." (Case No. 18-cv-3566-DJH, Doc. 22 at 4). EPI has also provided documents to TDBBS in response to a subpoena issued in that case. (Doc. 21 at 6, Exh. 1). TDBBS received those documents on February 11, 2019. (*Id.*)

TDBBS alleges that it first learned of EPI's competing product line at a February 4,

2019 trade show. (Doc. 1 ¶ 107). TDBBS believes the existence of this product line proves that trade secrets were misappropriated because it should take at least 18 months to develop a competing line given the product-specific difficulties, including finding suppliers, distribution challenges, and the niche market. (Doc. 1 ¶¶ 110–117). Among the documents provided by EPI in the *Fabits* Litigation was an email that TDBBS alleges proves that EPI participated in Fabits taking the Master List and Lost Revenue Reports: an email from Jonathan Zelinger ("Zelinger"), EPI's President, explaining why EPI wanted to hire Fabits. (Doc. 1 ¶ 102, Exh. A). The email stated that Fabits "knows where their Achilles heel is and where they are vulnerable and that's what we will be going after with his guidance should we finalize a deal with him." (*Id.*). The email also said TDBBS was having a "terrible fill rate and long lead time, there are many dissatisfied customers( low hanging fruit) [sic] that Tim feels we will be able to takeover." (*Id.*). He also noted that many of the companies in the single-ingredient pet chew business are experiencing management changes due to being bought out, making it easier to break into the market. (*Id.*).

During the March 13, 2019 preliminary injunction hearing and in his declaration, Fabits claimed he never sent the Master List or Lost Revenue Reports to anyone. He did not explain why he asked for the Master List on his last day other than "a vague sense that it might be useful." (Doc. 28, Exh. 1 ¶ 29). He also testified that he wanted the Lost Revenue Reports to be able to explain to his sales team why they were not receiving the commissions they expected. (Doc. 28, Exh. 1 ¶¶ 17–18). He says the reason he forwarded these materials is because it was easier to print from his personal email at his home office and has not kept physical copies of them. He further testified that he has not used any of the information from the Master List or the Lost Revenue Report in bringing the EPI product line to market, instead relying on relationships that pre-existed his time at TDBBS and his experience at Redbarn. TDBBS counters that this cannot be true because the Lost Revenue Report had a last saved date of October 16, 2018, and Fabits delayed for months in returning his TDBBS-provided laptop. (Doc. 21 at 5).

Prior to the preliminary injunction hearing, TDBBS deposed Zelinger. During the

Deposition, Zelinger said that during a May 2018 telephonic interview with Fabits, they discussed how Fabits could "leverage" his relationships to bring customers to EPI. (Doc. 30, Exh. 2). TDBBS alleges in this phone call, at a time when TDBBS still employed Fabits, Fabits told Zelinger about "horrific undershipping and short fill rates," unhappy TDBBS customers, and projected sales of a potential competing line. TDBBS alleges Zelinger "requested . . . commercially sensitive, nonpublic information" about TDBBS. (Doc. 30 at 4). Zelinger's own characterization of the conversation was that it was in "general terms" and that Fabits "just said that there were a lot of shortages." (Doc. 28, Exh. 2; Doc. 30, Exh. 2 at Tr 79:22–23). Later in the deposition, Zelinger said that in a follow-up, in-person interview Fabits may have said TDBBS had the hardest problem keeping bully sticks in stock and filling orders on them. (Doc. 30, Exh. 2 at 82:8–16). The in-person interview took place after Fabits's employment with TDBBS ended in June or July 2018. (*Id.*).

At the preliminary injunction hearing, TDBBS's new Vice President of Sales, Greg Solt testified. Solt began working at TDBBS April 30, 2018. (Testimony of G. Solt, March 13, 2019). He testified that TDBBS had a fill rate problem at the time of Fabits's departure from TDBBS and that it is still a problem for the company. (*Id.*). He also testified that the ballpark sales of TDBBS in 2018 was $89 million. He agreed that EPI's projected sales of $1.5 million in their first year would not have a significant effect on TDBBS.

TDBBS asks the Court to grant a preliminary injunction: "(a) requiring EPI (including but not limited to Fabits) to immediately cease using, and return to TDBBS, all of TDBBS's trade secrets and confidential information; (b) prohibiting EPI from directly or indirectly selling, exhibiting, marketing, advertising, or otherwise promoting its Fieldcrest Farms line, or any other animal body parts products, at the 2019 BCI Annual Spring Expo or the 2019 Global Pet Expo; and (c) requiring EPI, for a period of 18 months, to cease and desist from engaging in any pet treats and chews business that was developed or implemented, in whole or in part, directly or indirectly, with the assistance or input of Fabits, or using any of TDBBS's trade secrets or confidential information." (Doc. 21 at 2).

## II. Legal Standard

Under Rule 65 of the Federal Rules of Civil Procedure, a party may seek injunctive relief if it believes it will suffer irreparable harm during the pendency of an action. "A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("A preliminary injunction is an extraordinary remedy never awarded as of right."). A plaintiff seeking a preliminary injunction must show that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. "But if a plaintiff can only show that there are 'serious questions going to the merits'—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the 'balance of hardships tips sharply in the plaintiff's favor,' and the other two *Winter* factors are satisfied." *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1291 (9th Cir. 2013) (quoting *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)). Under this "serious questions" variant of the *Winter* test, "[t]he elements . . . must be balanced, so that a stronger showing of one element may offset a weaker showing of another." *Lopez*, 680 F.3d at 1072.

### 1. Likelihood of Success/Serious Questions

Plaintiff's Complaint includes 7 different claims. At the preliminary injunction hearing, Plaintiff focused on two: violation of the trade secret acts and aiding and abetting a breach of fiduciary duty by Fabits.

#### a. *Trade Secret Violation*

Plaintiff's claim is that Fabits misappropriated trade secrets when he took the "Master List" and "Lost Revenue Report" with him when he left employment with TDBBS. Defendant's Response does not fully develop an argument against finding that

TDBBS's information was a trade secret, instead focusing on their claim that the alleged trade secrets were never shared with them and they do not possess the information. Nevertheless, the Court will analyze whether Plaintiff has shown that the information was trade secret information.

"Trade secret" is a defined term under both Arizona and U.S. statutes. A.R.S. § 44-401(4); 18 U.S.C. § 1839(3). The definitions are broad and fairly similar. The federal statute, 18 U.S.C. § 1839(3):

> (3) the term "trade secret" means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if--
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

The state statute, A.R.S. § 44-401(4):

> (4) "Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique or process, that both:
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Because TDBBS has not provided any reasons the analysis would be different under each statute, the Court will largely rely on Arizona precedents. Arizona's definition is adopted from the "Uniform Trade Secrets Act ('UTSA'), which codifies the basic principles of common law trade secret protection." *Calisi v. Unified Fin. Servs., LLC*, 302 P.3d 628, 631 (Ariz. Ct. App. 2013). Under the Arizona Uniform Trade Secret Act, TDBBS must prove two elements: (1) the existence of a trade secret, and (2) actual or

threatened misappropriation. *See Calisi*, 302 P.3d at 631–32; *Miller v. Hehlen*, 104 P.3d 193, 201 (Ariz. Ct. App. 2005). In the absence of a conflict, the Court can rely on common law principles to interpret the statute. *Calisi*, 302 P.2d at 631. The subject matter of the information must be a secret and reasonable efforts must have been taken to keep the information secret. *Id.* "[T]he most important factor in gaining trade-secret protection is demonstrating that the owner has taken such precautions as are reasonable under the circumstances to preserve the secrecy of the information." *Enter. Leasing Co. v. Ehmke*, 3 P.3d 1064, 1070 (Ariz. Ct. App. 1999).

The evidence presented at the hearing shows that the Master List and Lost Revenue Report are likely trade secrets. The Master List contains product pricing information that takes months to create, including detailed information of pricing tiers for over 200 products. This document, according to the testimony of Solt, is based on TDBBS's understanding of the market for animal body parts developed over the life of the company. The pricing schedules are valuable because they are the baseline for negotiations with customers. This information would be valuable to a competitor and would enable a competitor to adjust its strategy in the marketplace. The pricing information would also allow a new entrant into the market to avoid the risk that is inherent in this market due to the variable pricing from suppliers. (Testimony of G. Solt, March 13, 2019). The Lost Revenue Report contains information about differences between what was ordered by customers and what TDBBS was actually able to ship to them. During testimony, this information was described as quantifying TDBBS's "fill rate" problem. That is, the reports provide valuable information about which products were being undersupplied to specific customers. This would be valuable to a competitor to identify specific customers that are unhappy or having problems with TDBBS. The competitor could then use that information to try to sway the customer to leave TDBBS.

The Court also believes that TDBBS has shown that it takes reasonable measures to preserve the secrecy of this information. TDBBS requires employees to sign confidentiality agreements and includes a section in the employee handbook about the

importance and secrecy of this information. TDBBS also claims that access to these documents is "limited to specific individuals who have a particular TDBBS business need for them." (Doc. 20 ¶ 75). Plaintiff has shown a likelihood of success in proving the Master List and Lost Revenue Report are trade secrets.

Was there misappropriation of trade secrets? There is no dispute that Fabits asked for a copy of the Master List on his last day of employment with TDBBS and that he then sent a copy of the Master List to his personal email account. The question is what happened after that. Fabits says that he deleted the Master List, did not retain a copy, and never gave a copy to EPI. The Court notes that there is a separate case against Fabits for misappropriation and this is not a case brought because of a non-compete clause. The line between misappropriation of trade secrets and the use of one's own experience and ability can be difficult to define. *See GTAT Corp. v. Fero*, No. CV 17-55-M-DWM, 2017 WL 2303973, at *3 (D. Mont. 2017) ("The primary challenge here is determining where [Plaintiff's] confidential information and trade secrets end and where [Defendant's] experience and ability begins.").

> Misappropriation is defined as either:
> (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means [OR]
> (b) Disclosure or use of a trade secret of another without express or implied consent by a person who either:
> > (i) Used improper means to acquire knowledge of the trade secret.
> > (ii) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use.
> > (iii) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

A.R.S. § 44-401(2). The definition in 18 U.S.C. § 1839(5) is almost identical.

TDBBS argues, without evidence, that Fabits shared the information with EPI. TDBBS argues that there is no way EPI could have come to market with this type of new

product within six months if they did not have trade secret information. (Doc. 1 ¶ 117). TDBBS's view is that single-ingredient, animal body parts chews present "challenges that are not present with mass produced treats." (Doc. 21 at 8). Specifically, TDBBS says that it is harder to find reliable suppliers, present significant distribution challenges, and require more effort to develop customer relationships because it is a niche market. (*Id.*). The Court does not find this argument persuasive. The trade secret information taken in this case relates to pricing and fill rate problems with specific customers. None of the information related to suppliers, distribution, processing techniques, storage techniques, marketing, or any other part of the production process. Plaintiff presented no evidence about how the trade secrets relate to the physical development of a new product.

Additionally, Fabits came to TDBBS with 14 years of experience working for Redbarn, a company that competes with TDBBS in the pet chew market. During a large portion of the time he was with Redbarn, it had a similar business model to TDBBS in that it bought product on the open market rather than producing it in its own facilities. (Testimony of T. Fabits, March 13, 2019). This meant he was familiar with sourcing the product and attended meetings with foreign and domestic suppliers. (*Id.*). TDBBS has provided nothing but conjecture to conclude Fabits shared the information contained in the Master List or the Lost Revenue Reports with EPI or that he has even referenced them since the end of his employment. Furthermore, the last saved date of the Lost Revenue Reports, October 16, 2018, can be easily explained by existence of the *Fabits* Litigation. Fabits also forwarded the Lost Revenue Reports *before* his relationship with TDBBS deteriorated, which leads the Court to conclude his explanation, at least in regard to those reports, is particularly credible.

TDBBS also relies heavily on an email from EPI president, Zelinger, as proof that EPI had access to the confidential and/or trade secret information. Despite TDBBS's representations, there is nothing in the Zelinger email that discussed trade secret information, either the pricing or specific fill rate problems. TDBBS has not met its burden of showing a likelihood of success based on actual misappropriation.

In its Reply, TDBBS raises four new claims of trade secret information: (1) The fact that TDBBS was having problems with its fill rate and lead time; (2) the existence of supposedly widespread customer dissatisfaction; (3) the identity of TDBBS customers that Fabits believes he could "leverage" for EPI's benefit; and (4) the existence of an "infestation problem" with a major TDBBS customer. (Doc. 30 at 4). Solt testified that the information about unhappy customers, the "low hanging fruit," would be confidential information. Zelinger testified in his deposition that infestation is a common problem with animal part chews. (Doc. 30, Exh. 2 at 129: 2–7). Fabits testified at the hearing that fill rate information becomes very well-known in the industry if there is a problem from a supplier. (Fabits testimony, March 13, 2019). Confidential information is not the same as trade secret information. This testimony from Solt and Zelinger leads this Court to find that this information may be confidential but is not trade secret information.

b. *Aiding and Abetting Breach of Fiduciary Duty*

An employee owes an employer a fiduciary duty. *Taser Int'l, Inc. v. Ward*, 231 P.3d 921, 926 (Ariz. Ct. App. 2010). "One aspect of this broad principle is that an employee is precluded from actively competing with his [] employer during the period of employment." *Id.* (citing *Sec. Title Agency v. Pope*, 200 P.3d 977, 989 (Ariz. Ct. App. 2008)). An employee, however, may make arrangements to compete. *Pope*, 200 P.3d at 926. An employer can be liable for aiding and abetting a breach of fiduciary duty by substantially assisting or encouraging the breach. *Id.* While TDBBS has shown that Fabits entered into new employment that is in direct competition with it, there was no such showing that he competed while still employed at TDBBS. Plaintiff relies on the fact that Fabits interviewed with EPI during his employment with TDBBS and spoke to Zelinger about what he could offer to EPI.

That does not constitute a breach of fiduciary duty as it is merely preparation to compete. Fabits was not prohibited from seeking new employment while still working for TDBBS. TDBBS argues that it was at Zelinger's request that Fabits provided "commercially sensitive, nonpublic information of TDBBS, including performance data

and the names of customers he could bring over to EPI." There is no evidence that any specific confidential information was shared during that phone interview. Zelinger specifically told TDBBS, during his deposition, that Fabits did not discuss specific customers that were unhappy or having fill rate problems during the May interview. In a general sense, Fabits did tell Zelinger about four customers that he had a good relationship with and he thought he could bring over. However, general information about the names of customers a sales representative had a good relationship with hardly seems confidential. Fabits did not disclose any private information about what products they bought, how much they bought, or what the fill rate was for those customers. The four customers discussed were already customers of TDBBS. Plaintiff's argument that Zelinger encouraged Fabits to breach his fiduciary duty is a stretch. Zelinger testified at his deposition that Fabits discussed why he was unhappy at TDBBS and the problems that TDBBS was having. Fabits also suggested how he could use his experience to benefit EPI. There is no information about that phone call that would constitute encouragement by Zelinger. TDBBS has not met its burden of showing a likelihood of success for aiding and abetting a breach of fiduciary duty.

### 2. Irreparable Harm

Irreparable harm is harm for which there is no adequate remedy at law, such as money damages. *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance. Demonstrating irreparable harm is not an easy burden to fill." *DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1270 (10th Cir. 2018) (internal quotation marks and citation omitted); *see also Dalkita, Inc. v. Distilling Craft, LLC*, No. 18-cv-01398-PAB-SKC, 2018 WL 6655628 (D. Col. Dec. 19, 2018).

Plaintiff argues that irreparable injury is to be presumed in cases of trade secret violations. However, the cases relied on by Plaintiff are not persuasive. The order they cited by Judge Campbell, *JP Morgan Sec. v. Krich*, No. CV-15-00979-PHX-DGC, 2015

WL 3604199, at *4 (D. Ariz. June 8, 2015), discusses whether loss of investment clients to an investment firm because of a former employee constituted irreparable harm. *Krich* cites cases and summarized that "courts are split" on the question, but have held there is irreparable harm "particularly when ... the firm has invested considerable effort in cultivating and growing the goodwill and business of the clients." 2015 WL 3604199 at *4. *Krich* noted that another court disagreed because the "investment advisor industry is heavily regulated, transactions are monitored electronically, every trade is recorded, and any loss to the former firm is easily calculable." *See Morgan Stanley v. Frisby*, 163 F.Supp.2d 1371, 1376 (N.D. Ga. 2001). Given that this is a brand new line by EPI, it seems that most of their growth, if TDBBS really shows it is from Fabits and EPI's malfeasance, would be easily calculable.

TDBBS's reliance on *Metso Minerals Ind. v. Oakes*, No. CV-14-00013-PHX-DGC, 2014 WL 1632927 (D. Ariz. April 23, 2014), is also misplaced. Though it is a trade secret case, it is not applicable here. There, the defendant "did not dispute that disclosure of trade secrets would cause irreparable injury" and the plaintiff "presented evidence tending to prove that [defendant] still possesses [plaintiff's] trade secrets months after his termination." *Id.* at *3. TDBBS also quotes cases saying, "under Arizona law, once a protectable interest is established, irreparable injury is presumed to follow if the interest is not protected." *Compass Bank v. Hartley*, 430 F. Supp. 2d 973, 983 (D. Ariz. 2006) (quoting *Phx. Ortho. Surgeons v. Peairs*, 790 P.2d 752, 757 (Ariz. Ct. App. 1989)). Both of these cases are in the context of enforceable restrictive covenants (non-competes). That is a different analysis than applies in this case, because non-competes are entered into exclusively to prevent competition. Here, Plaintiff is not seeking to enforce a non-compete agreement, and there is uncertainty about what trade information Fabits knew from his previous employment and what he learned from TDBBS.

In addition, other courts have found that the presumption is not mandatory. *See, e.g., Calence, LLC v. Dimension Data Holdings, PLC*, 222 Fed. Appx. 563, 566 (9th Cir. 2007) ("Even assuming that this case involves trade secrets, the district did not err in failing

to presume irreparable harm because of alleged trade secret loss."); *Ossur Holdings, Inc. v. Bellacure, Inc.*, No. C05-1522JLR, 2005 WL 3434440, at *8 (W.D. Wash. 2005) ("Courts in the Ninth Circuit erect a presumption of irreparable harm where a plaintiff proves likely success on the merits of a copyright or trademark infringement claim; however, the court is aware of no binding authority that applies such a presumption in the context of a trade secrets claim.").

TDBBS has also not persuaded the Court that they will suffer any damages that are not monetary. *See Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 123 (9th Cir. 1984) ("Purely monetary damages are not normally considered irreparable."). Though TDBBS has alleged damages to "goodwill," they have not presented any evidence of such damage. In weighing the potential harm to TDBBS financially, the Court cannot overlook the testimony of Solt. Solt testified that the $1.5 million in estimated sales by EPI in its first year would not have a significant effect on TDBBS. Additionally, Solt testified that the Master List is no longer valid as it was updated on Feb 5, 2019. Since there can be no future use of an outdated pricing list, the harm has already occurred, if at all. Preliminary injunctions are not meant to remedy past harms but to prevent future use of trade secret information. *See Freedom Medical Inc. v. Whitman*, 343 F. Spp. 3d 509, 530 (E.D. Penn. 2018)

### 3. **Balance of Equities**

Plaintiff has not met its burden of proving a likelihood of success on the merits or irreparable harm. Since Plaintiff must show all four parts to obtain a preliminary injunction and has failed on two, there is no need for the Court to analyze the balance of equities or the public interest prongs. However, the Court may issue a preliminary injunction even where a plaintiff does not show a likelihood of success on the merits if they raise a serious question about the merits and the balance of equities weighs in their favor. *Shell Offshore*, 709 F.3d at 1291. So, the Court will discuss the balance of equities to see if the injunction should issue. The parties only briefly argue about the balance of the equities. "To determine the balance of equities, the Court must 'balance the interests of all parties and

weigh the damage to each.'" *Nat'l Assoc. of Wheat Growers v. Zeise*, 309 F.Supp. 3d 842, 853 (E.D. Cal. 2018) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)).

On the one hand, Fabits requesting the Master List on what ended up being his last day of employment and not turning over his computer promptly raises serious questions about his motives, but it does not prove wrongdoing by EPI. Without the requested injunctive relief, TDBBS will have to compete with EPI in the single-ingredient dog chew business. By TDBBS's own estimate, without its alleged trade secrets, EPI could develop competing products in 18 months. They allege EPI was selling its line six months after it hired Fabits. Thus, TDBBS is arguing that EPI got a 12-month head start in the market. That weighs in TDBBS's favor.

On the other hand, TDBBS is attempting to stop EPI from selling its competing line at, in TDBBS's own words, "the pet industry's largest and most important trade show." (Doc. 20 ¶ 9). Furthermore, EPI has already received orders from its distributors, so an injunction would affect EPI's overall business relationships and not just the competing line, and it would result in the loss of valuable inventory that has a limited shelf-life. Accordingly, the Court finds this factor does not weigh in either parties favor and is neutral.

**III. Conclusion**

Plaintiff has not met its burden of proving a likelihood of success on the merits or irreparable harm. In addition, the balance of equities at this point does not weigh heavily in the Plaintiff's favor but is neutral. Therefore,

**IT IS ORDERED** Plaintiff's request for a preliminary injunction (Docs. 1, 3) is **DENIED.**

Dated this 18th day of March, 2019.

Honorable Susan M. Brnovich
United States District Judge

- 14 -